FERNANDO SIERRA BERDECÍA, COMMISSIONER OF LABOR OF PUERTO RICO, Plaintiff and Appellee, v. TEÓDULO LLAMAS, ETC., Defendant and Appellant.

No. 10609.   Argued August 26, 1952.—Decided October 14, 1952.

848

*Víctor Rivera Colón* for appellant. *Joaquín Gallart Mendía,* counsel for the Department of Labor and for appellee.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

Under the provisions of Act No. 8 of April 5, 1941, as amended, Fernando Sierra Berdecía, Commissioner of Labor of Puerto Rico, filed in the former District Court of Puerto Rico, San Juan Section, an injunction suit against Teódulo Llamas, doing business as T. Llamas, Hielo, alleging that

defendant and appellant herein is engaged in the manufacture of ice and its sale at retail; that after April 5, 1945, on which date Mandatory Decree No. 8 of the Minimum Wage Board applicable to retail businesses was promulgated, defendant has refused to grant to a group of his employees, who are drivers and helpers, leave with full pay, at the rate of fifteen days per year, which they have accumulated during more than two years, those chauffeurs and helpers being engaged in the retail sale of respondent's ice, all of which violates the provisions of paragraph F-3 of said Mandatory Decree No. 8.[1] The Commissioner of Labor requested the lower court to issue a writ of permanent injunction ordering defendant to grant the aforesaid employees the accumulated leave, with full pay and to establish the corresponding shifts, and forbidding defendant to continue in his practice of violating the afore-cited paragraph F-3 of Mandatory Decree No. 8.

Defendant answered and the case was heard on its merits at a pre-trial conference, which served as the hearing of the case. In said hearing defendant admitted the fact that he had not granted leave, pursuant to said paragraph F-3, to a group of chauffeurs and helpers employed by defendant and who were engaged in the selling of ice directly to the consumers. Defendant alleged, however, that Mandatory Decree No. 8 did not apply to those employees and the issue was joined on whether or not the decree was applicable. Both

---

[1] Paragraph F-3 of the aforesaid Decree No. 8 provides as follows:

"Every permanent employee, with the exception of the apprentice, who after the date of promulgation of this Decree works during at least twelve consecutive weeks for the same employer, shall be entitled to vacation with full pay at a rate of fifteen days per annum. Vacation time may accrue over a period of two years and shall be granted by the employer at the request of the employee in such a manner as not to interrupt the proper operation of the business, to which end the employer shall prepare in advance a vacation schedule. In case of termination of his work, the employee shall receive payment for the vacation period which has accrued. If the wage has not been stipulated by the day or any longer period, the compensation for the vacation period shall be computed in the manner provided for sick leave."

parties introduced oral and documentary evidence which we shall hereinafter discuss in part regarding the construction of Decree No. 8 as to its scope and applicability. The representatives of the Commissioner of Labor insisted that said decree was applicable but if it were not, then Mandatory Decree No. 12 which refers to the transportation service in Puerto Rico, would apply.

The former District Court of Puerto Rico, San Juan Section, rendered judgment sustaining the writ of injunction, and defendant has appealed from that judgment, assigning as a sole error that:

"The lower court erred in holding that Mandatory Decree [No. 8] is applicable to the Ice Industry, which is defendant's business."

Paragraph A, subdivision 1, of Mandatory Decree No. 8 of the Minimum Wage Board provides as follows:

"*Definition of the Business*: The business of selling at retail, to which this Decree applies, is the business defined as follows:

"The Business of Selling at Retail comprises, without contemplating any limitation whatsoever, any act, process, operation, work or service, necessary, incidental or related to retail sales or direct conveyances to consumers, of any kind or commodities or articles, for money, promises of thing of value, whenever such sales or conveyances originate, are transacted or consummated in any establishment *or place wholly or partially dedicated to such purposes,* or whenever made outside such establishment or place in its name or for its benefit. The businesses, industries, occupations, or branch thereof which in Decree No. 6 of this Board, applicable to hotels, restaurants, bars, and soda fountains (which Decree shall not be impaired in any manner whatsoever) are subject to regulation or excepted from its scope, shall, however, be excluded." (Italics ours.)

The court *a quo* did not hold that Decree No. 8 was applicable to the entire ice manufacturing industry, nor does this case involve any determination whatsoever as to defendant's employees who are not engaged directly in selling ice to consumers. The lower court held that defendant's drivers

and their helpers who are the ones that actually sell the ice directly to consumers, are covered by the provisions of Decree No. 8. Considering those employees separately, it can not be gainsaid that they are engaged in the retail selling of ice.[2] However, appellant's argument is to the effect that, in brief, since there is no Mandatory Decree whatsoever applicable to the ice industry, No. 8 must not be applied to any employees whatsoever of said industry; that Decree No. 8 exclusively applies to merchants who buy pre-manufactured articles and sell them to consumers and not to manufacturers who manufacture and sell articles as part of the same business, that the investigation carried out by the corresponding committee, on which the Board based its approval of Decree No. 8, exclusively referred to merchants and vendors solely engaged in retail business, and it did not include any industry whatsoever, although said industry sold its products, and that the construction given to Decree No. 8 by some members of the Board excludes the applicability of said Decree.

Considering the fundamental public policy which the legislator had in mind in approving Act No. 8 of 1941 (known as the Minimum Wage Act) that is, to improve the labor conditions detrimental to the maintenance of the minimum standards necessary for health efficiency and general well-being of workers—*Hospital San José* v. *Minimum Wage Board*, 63 P.R.R. 717, 719—if there exists any legitimate doubt as to whether the decree is applicable to a particular type of employees, the Act should not be strictly construed so as to exclude those employees from the protection of the Decree. Naturally, if it is clear that the decree is not ap-

---

[2] Although the same legal situation raised in this case is not exactly involved in *National Ice & Cold Storage Co.* v. *Pacific Fruit Exp. Co.*, 79 P. 2d 380, of California it is convenient to point out that there it was held that a tax on retail sales was aplicable to the sales of ice of a company which used the ice not for direct use but for the purpose of refrigeration of railroad cars inasmuch as the ice was not bought for resale. To that effect see *People* v. *Monterey County Ice & Development Co.*, 84 P. 2d 1069, where it is held that a company's sales of ice to be used in the refrigeration of lettuce are retail sales.

plicable to certain groups of employees, this Court must not substitute the opinion of the legislator or of the Minimum Wage Board with its own. As to this point, we have little to add to what has been set forth by this Court in *Hospital San José* v. *Minimum Wage Board, supra,* at page 722:

"The duties imposed on the board and on the minimum wage committees appointed thereby and the powers conferred upon them by the Act, are primarily inspired in the wish of our Legislature to improve the health, security, and well-being of workers, after said bodies have investigated the wages, working hours, and labor conditions prevailing in the different occupations, businesses, and industries in Puerto Rico. The only persons excluded from the provisions of the Act are those employed as domestic servants. Any defect or omission in the definitions of the different words or phrases included in § 30, *supra,* should not be a ground for our construing the scope of the Act in such manner as would impair fundamental purpose of the same. As Mr. Justice Frankfurter said, speaking for the Federal Supreme Court, in the case of *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 185, in construing the scope of the National Labor Relations Act: 'Unlike mathematical symbols, the phrasing of such social legislation as this seldom attains more than approximate precision of definition. That is why all relevant aids are summoned to determine meaning. Of compelling consideration is the fact that words acquire scope and function from the history of events which they summarize.' In the Federal Act the only definition of the word 'employee' in an affirmative form was to the effect that said term 'shall include any employee' and then in a negative form it excluded agricultural employees, those employed as domestic servants or any person employed by his father or husband. The Federal Supreme Court, construing the scope of the word 'employee,' said in the case of *National Labor Relations Board* v. *Hearst Publication,* decided about a month ago, on April 24, 1944 (322 U. S. 111), that 'the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as "employee," "employer," and "labor dispute," leaves no doubt that its applicability is to be determined broadly, *in doubtful situations,* by underlying economic facts rather than technically and exclusively by previously established legal classifications. . . .

That term (employee), like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship.' "

In *Board* v. *Hearst Publications*, 322 U. S. 111, 129 cited in *Hospital San José* v. *Minimum Wage Board, supra*, it is stated that the scope of the term "employee" ought not be unduly restricted and must be understood with reference to the purpose of the Act, and it is said:

"Where all the conditions of the relation require protection, protection ought to be given."

In the more recent case of *Phillips Co.* v. *Walling*, 324 U. S. 490, 493, the Supreme Court of the United States held:

"The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to . . . working men and women a fair day's pay for a fair day's work.' . . . Any exemption [or exclusion] from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

Paragraph A, subdivision 1, of Mandatory Decree No. 8 includes retail sales made in any establishment or place totally or partially destined for such purposes. Not only is it fair to state that defendant's plant is partially engaged in selling ice to consumers but that actually the main purpose of said plant is to sell directly to consumers. The plant would be of no importance without those retail sales. Paragraph A, subdivision 1 does not exclude employees who are engaged in retail business solely because articles thus sold are made in their employer's factory. Said provision has a wide scope, and the judge must not supply an exclusion where the Decree does not provide it, especially if the Decree includes all the employees who are engaged in retail business.

For the foregoing reasons, said paragraph A, subdivision 1 applies to the workers involved herein.

In *Sierra, Commissioner* v. *L. Rodríguez & Co.*, 72 P.R.R. 1, it is held that the employees of a tailor shop attached to a retail commercial establishment are covered by Mandatory Decree No. 8 inasmuch as it is not a business separate and independent from said store but rather part thereof. In *Commissioner of Labor* v. *San Miguel Fertilizer Corp., ante*, p. 327, defendant manufactured fertilizers and sold them to planters, other farmers, aviculturists and stock farmers. It was held that the employees working in the establishment engaged in the distribution or sale of said products to said persons were covered by Paragraph A-1 of Decree No. 8.

In *Sierra, Commissioner* v. *Morales*, 72 P.R.R. 647, it was held that Decree No. 8 did not apply to chauffeurs transporting wholesale merchandise notwithstanding the fact that said merchandise was transported also to other retail businesses operated by the employer. The *ratio decidendi* was that defendant continued being a wholesaler despite the fact that he supplied himself with merchandise from his own warehouse. The case therefore, is inapposite herein.

The Fair Labor Standards Act provides that the laborers or employees who are engaged in retail business are exempt and not covered by the provisions of the Act. In *Phillips Co.* v. *Walling, supra*, the petitioner corporation operated a chain of 49 retail grocery stores besides having a warehouse. It was held by the United States Supreme Court that although the employees working in the grocery stores were exempted, the warehouse employees were not, nor were the central office employees, and inasmuch as they were engaged in a different and separate activity, the business could not be considered as integrated. It implied, however, that the employees at the stores received a different treatment under the law. See the commentary and Annotation on this case at 157 A.L.R. 881.

That same Act and exemption for retail business employees, were invoked in *Samuels* v. *Houston*, 46 F. Supp. 364, which was a case dealing with an establishment engaged in the manufacture of ice and the sale thereof. It was held that the ice plant was a retail establishment because it was essentially engaged in commerce. However, the particular employee worked in the plant and not in commerce. Therefore, the case is not directly in point. *Collins* v. *Kidd*, 38 F. Supp. 634, also dealt with an ice plant but a view contrary to that expressed in *Samuels* v. *Houston*, *supra*, was set forth therein.

█ It is true that at the hearing in the lower court, one of the members of the Minimum Wage Board who was also a member at the time Decree No. 8 was approved, stated his view to the effect that the intention of the Board had been to render Decree No. 8 applicable solely to commercial establishments. Said testimony was not admissible. Where legislation is ambiguous, the ambiguity may be orally explained, but a legislative record can not be limited by oral evidence as to the motives, purposes or personal actions of its particular members. *Elicier* v. *Heirs of Cautiño*, 70 P.R.R. 407, 409; 20 Am. Jur. 1021; 98 A.L.R. 1240. The testimony of a particular member of a Legislative body is not admissible to show that the legislative intent differs from the one expressed in the statute itself. *Ex parte Goodrich*, 117 Pac. 451.[3] At any rate even if said opinion is admissible, it is not binding on the courts.[4]

█ The fundamental problem under our consideration which deals with the applicability of Decree No. 8 to em-

---

[3] This situation differs from the one decided in *Sierra, Commissioner* v. *Quilinchini*, 72 P.R.R. 615, where it was stated citing from the Syllabus: "In order to determine the intention of the Minimum Wage Board in the case where a Mandatory Decree fails to expressly state anything specifically with respect to employees in the industry covered by it, resort may be had to the concept applied by *the Board* to those employees in other activities." (Italics ours.)

[4] As a matter of fact another member of the Board, who intervened in the approval of the Decree, held a contrary opinion.

ployees involved in this litigation is the fact that the ice manufacturing industry did not take part, specifically and as such, in any administrative proceedings which culminated in the approval of the aforesaid Decree. There was no representative of said particular industry in the committee which formulated the corresponding recommendations to the Minimum Wage Board. The representatives of the employers in said committee were exclusively merchants, some representing the dry goods and others representing the wet goods. Said committee investigated different establishments, such as grocery stores, shoe stores, drugstores, hardware stores, textile and novelty shops. The economic activity of the ice industry was not investigated. Based on the investigation of the committee, the Minimum Wage Board adopted Decree No. 8. In the notices published in the newspapers regarding the organization of the committee and the public hearing held by the Minimum Wage Board concerning said decree, the ice manufacturing industry was neither mentioned nor specifically notified.

Briefly, petitioner argues that, as owner of an ice manufacturing business he did not have a fair and proper hearing at any stage of the proceeding which culminated in the approval of the decree; that he was not duly notified and that his business was not investigated, for which reason, it would be unfair and contrary to law, according to the petitioner, to apply said decree to petitioner's business in any of its aspects.

As a whole, we agree that when it is contemplated to apply a decree to a person, business, or entity it must have a fair opportunity of being heard, which includes due notice before the adoption of the decree and at any stage of the proceeding. *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126, 152, 153; 51 Yale Law Journal, 1093, 1104. These requirements of notice and opportunity to be heard are defined by the corresponding statute which establishes the power of an administrative body to adopt minimum wage orders, which,

in this case, is Act No. 8, approved on April 5, 1941.[5] Let us examine the pertinent Sections of said Act, known as the Minimum Wage Act, as they read at the time the Mandatory Decree involved herein was approved.

Section 6 of said Act provided then as follows:

"Section 6.—Whenever the wages paid in any occupation, business, or industry, or in any operation, branch, process, or activity thereof, are insufficient to satisfy the normal needs of workers and are detrimental to the maintenance of the minimum standard of living necessary for their health, efficiency, and general well-being, it shall be the duty of the board to appoint a Minimum Wage Committee composed of two representatives of the employers to be submitted by the employers, and two representatives of the workers in said occupation, business, or industry, or in the operation, branch, process, or activity of said occupation, business, or industry, to be submitted by the workers, and of a fifth member in representation of the public interest, who shall be the chairman of the committee.

"The members of said minimum wage committee shall receive a per diem of five (5) dollars whenever they meet on official business, and they shall be paid such traveling expenses as may be necessary for the discharge of their duties.

"The board shall promulgate rules and regulations relative to the selection of the members of said committees and to the proceedings thereof, and shall have exclusive jurisdiction over all questions that may arise as to the validity of the proceedings of, and the recommendations made by, said committees. The

---

[5] The judicial authorities are in conflict as to whether an adequate notice is, in the absence of a statute, a constitutional requisite of a due process of law. 51 Yale Law Journal 1104; Gellhorn, Administrative Law, Cases and Comments, p. 331–460. Kenneth Culp Davis, commentator, expresses his opinion to the effect that a trial is appropriate when a dispute arises about adjudicative facts which peculiarly relate to particular parties as for example, in the case of public utility rates, but that economic, financial, and statistic facts of a general character, not limited to particular parties, usually would be better developed without following courtroom methods as in the case in price–fixing proceedings. 51 Yale Law Journal 1106, 1107, 1140. It is needless to consider this question in the case at bar inasmuch as our Minimum Wage Act establishes the notice and hearing proceedings. But we must point out the possibility that the requirement of notice in cases of wage fixing may not be as strict as in the cases of rates–fixing.

proceedings and deliberations of the minimum wage committees shall be put in writing for the use of the board and shall be admissible as evidence in any proceedings before the board.

"The board shall furnish the minimum-wage committees with adequate legal, accounting, stenographic, and clerical assistance, and such other personnel as may be necessary to carry out their work.

"When directed by the board, it shall be the duty of any minimum wage committee to investigate the labor conditions prevailing in such occupations, businesses, or industries as the board may direct, and to report its findings to the board, including the following:

"(1) An estimate of the minimum wage indispensable to satisfy the normal needs of workers employed in the occupation, business, or industry in question and to maintain the minimum standard of living necessary for their health, efficiency, and general well-being.

"(2) The number of working hours in each day in the occupation, business, or industry in question consistent with the health, safety, and well-being of such workers.

"(3) Labor conditions required for the maintenance of the health, safety, and well-being of workers in said occupation, business, or industry.

"Every minimum-wage committee shall submit a report to the board within a period of three (3) months or within such extension of time as the board may grant in justified cases. In case any minimum-wage committee fails to submit its report within the prescribed period, or within such extension of time as may be granted to it, or in case the members thereof are unable to agree and to submit a report by a majority vote, the board may declare said committee dissolved and appoint another to make the corresponding investigation and report."

Sections 8, 9 and 10 read thus:

"Section 8.—Taking as a basis the report rendered by the minimum-wage committee, and after a public hearing of the interested parties and of the public, the board shall have power to fix:

"(1) The minimum wage rate which must be paid to workers employed in the occupation, business, or industry in question, or in the operation, branch, process, or activity of the occupation, business, or industry in question.

"When the minimum wage fixed is less than the one recommended by the committee, the board shall address the department, bureau, or body of the Government of Puerto Rico connected with that branch of production, requesting the former to aid the latter, and to encourage or promote its progressive development, in order that it may pay as soon as possible the wages recommended by the committee.

"(2) The maximum working hours consistent with the health, safety, and general well-being of workers in said occupation, business or industry; *Provided,* That the hours fixed shall not exceed the maximum established, or which may hereafter be established, by law.

"(3) Labor conditions required for the maintenance of the health, safety, and well-being of workers in said occupation, business, or industry.

"Section 9.—As soon as the board shall fix the time and place for the holding of a public hearing for the purpose of considering and determining the matters stated in the preceding section, it shall proceed to give notice of said hearing by an announcement which shall be published ten (10) days in advance in at least one newspaper of general circulation in the Island.

"Section 10.—After holding said hearing, the board shall issue a mandatory decree, which shall take effect sixty (60) days after its promulgation, establishing the minimum wage rate which shall be paid to the workers employed in the occupation, business, or industry in question, or in the operation, branch, process, or activity of said occupation, business, or industry in question; the maximum working hours, and the labor conditions necessary for the maintenance of the health, safety, and general well-being of the workers in said occupation, business, or industry."

Section 12 as amended by Act No. 9 of March 20, 1942, in force at the time Decree No. 8 was approved, provides in part as follows:

"Section 12.—In fixing minimum wages, the board shall take into consideration the cost of production, the financial and economic conditions of the industries or branches of production affected and the market fluctuations, as well as the special conditions prevailing in the zone or area in question.

"On recommendation of the corresponding Minimum Wage Committee, the board may classify the works in any occupation, business, or industry according to the nature of the services to be rendered, and approve minimum-wage scales suitable for different kinds of work, for the purpose of fixing for each classification the highest rate of minimum wage compatible with the purposes of this Act. The board may also approve different minimum wages for different zones or districts when, in the judgment of the board, such differentiation may be advisable due to the conditions existing in said zones or districts, provided that such action does not give competitive advantage to another or other zones or districts; *Provided, however,* That in approving the minimum wage for any occupation, business, or industry, the rate fixed shall be uniform for every occupation, business, or industry of the same class, category, or importance in the zone or district in question."

It must be observed, as to this last Section, that the amendment introduced by said Act No. 9 implies the omission of the requirement that the rate of wage shall be uniform for every occupation, business or industry but it introduces the new theory that wages may be approved for different kinds of work in any occupation, business or industry.

Section 24 as it read at the time the decree was adopted provides as follows:

"Section 24.—(*a*) In every proceeding for the violation of any of the provisions of this Minimum Wage Act, the maximum working hours and the labor conditions fixed by the board, as hereby determined, shall be considered *prima facie* as reasonable and legal and as constituting the living wage, the maximum working hours, and the labor conditions which this Act requires.

"(*b*) The findings of fact at which the board acting within its powers may arrive shall, in the absence of fraud, be conclusive; *Provided,* That any person directly or indirectly aggrieved by any decree or rule of the board may apply to the latter for reconsideration within twenty (20) days after the promulgation of such decree or rule. The petition for reconsideration shall be made under oath and the same shall contain the grounds on which it is based; *Provided,* That reconsideration shall be granted only for one of the following causes:

"That the board acted without authority or beyond its powers; or that the decree, rule, or order was obtained through fraud.

"A review of the final decision which the board may render in the matter, may be obtained in the Supreme Court of Puerto Rico within a term of fifteen days after the service thereof. The court may affirm or set aside the decision of the board; but the setting aside shall be only for one of the following reasons:

"That the board acted without authority or beyond its powers; or that the decree, rule or order was obtained through fraud.

"(c) The filing of a petition for reconsideration shall operate as a stay of the decree, rule, or order in question only as to the petitioning party or parties and for a period of not more than twenty days, unless the board extends the term of the stay, for which action full powers are hereby conferred upon it.

"(d) As soon as a petition for review is filed with the Supreme Court, it shall be the duty of the board to forward to said court the original record of the case consisting of the findings of the minimum-wage committee, the record of the hearings held by the board, the decree complained of, the petition for reconsideration, and the decision rendered, as well as any other proceedings had in the case.

"The petition for review by the Supreme Court shall operate as a stay of the decree complained of, upon the filing of an undertaking to answer for the total payment of the wages involved in the proceedings plus a reasonable amount for fees in case the court sets aside the proceedings."

Section 30 provides, in part, the following as to definitions:

".        .        .        .        .        .        .        .

" 'Employer' includes every natural or artificial person engaged in industrial, commercial, business, agricultural, or public-service activities, who employs laborers, employees, or workers, for pay, wage, salary, or any other form of compensation.

" 'Employer' includes the manager, official, promoter, administrator, superintendent, foreman, overseer, agent, or representative of said natural or artificial person.

" 'Occupation' includes every work or labor in factories, mills, centrales, shops, establishments, manufactories, farms, plantations, ranches, transportation, and communication enterprises,

and places of any kind where gainful work or business is done or transacted.

"'Business' includes every work or labor in warehouses, stores, establishments, or places of any kind where commercial transactions are made or services are rendered for remuneration.

"'Industry' includes every work or labor done in factories, shops, machine shops, or establishments or places where work is done for construction or building, or for the obtainment, transformation, or transportation of one or more natural products, or where articles or goods are processed for commerce.

"'Laborer', 'Employee', 'Worker', include every manual worker, artisan, day laborer, clerk of a store, and every person employed for remuneration in any occupation, business, or industry.

"The terms included in this section shall not exclude any other term embracing agricultural, industrial, or commercial activities.

"The provisions of this Act shall not be applicable to persons employed as domestic servants."

In the instant case the corresponding notices were published requesting the names of candidates in order to form the committee and also regarding the holding of a public hearing in connection with the decree in question. Those notices read as follows:

"NOTICE

"TO THE EMPLOYERS AND EMPLOYEES IN RETAIL BUSINESS

"The employers and employees engaged in Retail Business as it is hereinafter defined, are requested to submit candidates for the Minimum Wage Committee which shall investigate said retail business for the purpose of recommending to this Board the minimum wage, hours of work and conditions which must prevail therein.

"The Committee in question will be formed by five persons: two labor representatives, two in representation of the employer's interest and the fifth member in representation of public interest who shall also be chairman of the Committee. The employers as well as the employees, or whatever organizations they may have, may submit as many candidates as they deem convenient, which should not be less than four by each party,

in order that the Board may have an opportunity to choose. Any number of employers or employees may meet, elect their representatives and submit their names to this Board as candidates for the aforesaid committee.

"The employers or employees entitled to submit candidates are the ones comprised in the following definition of retail business, which may be enlarged or limited, as amended for said purpose.

" 'The Business of Selling at Retail comprises, without contemplating any limitation whatsoever, any act, process, operation, work or service, necessary, incidental or related to retail sales or direct conveyances to consumers, of any kind or commodities or articles, for money, promises of thing of value, whenever such sales or conveyances originate, are transacted or consummated in any establishment or place wholly or partially dedicated to such purposes, or whenever made outside such establishment or place in its name or for its benefit. Those establishments included in Mandatory Decree No. 6 of this Board, (which will not be impaired in any form whatsoever), such as hotels, restaurants, bars and soda fountains and which are regulated or excepted from the scope of Decree No. 6, are excluded.'

"The names of candidates may be submitted until May 23, 1944 in the office of the Board.

"May 9, 1944

"Minimum Wage Board
"Box 3910
"Santurce, Puerto Rico

"Gabriel Guerra Mondragón,
President."

### "Notice

"The date for submitting candidates from which the Board shall appoint the Minimum Wage Committee which shall investigate Retail Business is hereby postponed until May 30, 1944.

"The employers and employees are urged to meet and send said candidates at their earliest convenience so that the Board may have the opportunity of selecting those persons who will most legitimately represent said parties.

"May 26, 1944

"Gabriel Guerra Mondragón,
President."

NOTICE OF PUBLIC HEARING
"RETAIL BUSINESS

"Every employee, employer or person interested in retail business and the public in general is hereby notified that the Minimum Wage Committee appointed by this Board to investigate the aforesaid business and formulate its findings to the Board, has submitted the corresponding report and recommendations, including an estimate of the indispensable minimum wage, reasonable hours of labor and the conditions of work required pursuant to the provisions of § 6 of Act No. 8 of April 5, 1941, subsequently amended.

"Everyone is notified that the Minimum Wage Board in view of the afore-mentioned report, shall hold a public hearing on Wednesday September 27, 1944 and subsequent day or days if needed, at 9:00 a.m. in the assembly hall of the Department of Agriculture and Commerce, Fernández Juncos Ave., Stop 19, Santurce, city of San Juan, in order to consider the afore-mentioned report, hear the parties in interest and the public as regards said matter and determine in due time: 1—The minimum wage that must be paid to the employees in retail business; 2—the maximum hours of labor consistent with the health, safety and welfare of said employees; 3—the labor conditions required for the conservation of health, safety and welfare of employees; and 4—any other matter relating to the ends sought.

"Those persons who are interested in a copy of the afore-mentioned report may obtain it in this Board and those who wish to appear at the hearing shall please inform the undersigned in writing in furtherance of a better organization.
"San Juan, Puerto Rico, September 15, 1944.

> "Gabriel Guerra Mondragón,
> President."

Generally speaking, it is not necessary to literally list in a notice of public hearing on an administrative action each and every one of the persons who might be affected by the administrative decision. If there is a group of persons with similar interests which may be affected by the resolution of the Board, it is not necessary to specifically notify each and everyone of those persons, since that would be impracticable and contrary to administrative convenience. For

example, in *Bowles* v. *Willingham*, 321 U. S. 503, 519, 521, it is held that in fixing reasonable rents it is not necessary to give notice or provide a hearing to all the thousands of landlords who may be affected thereby. It is set forth in the opinion that had Congress directly legislated the fixing of rents, it would have been under no necessity to give notice and provide a hearing when it delegated the task to an administrative agency. It is likewise indicated, in said opinion of the United States Supreme Court that the statute provides for judicial review and that said review satisfies the requirements of due process under the circumstances in said case. In *Bi-Metallic Co.* v. *Colorado*, 239 U. S. 441, Justice Holmes, in the name of the Court states that when a rule of conduct applies to several persons, it is impractical that each and everyone of those persons take part in the formulation of said rule. See also *People* v. *Orvis*, 133 N. E. 787.

Specifically referring to wage orders, we adopt and approve the opinion set forth in *Pearson* v. *Walling*, 138 F. 2d 655, certiorari denied in 321 U. S. 775. Said case refers to the fixing of wages by the Administrator of the Wage and Hour Division. It was held that the definition of lumber and timber products industry, by its exclusion of manufacture of specialized timber products was reasonably sufficient to include manufacture of bows and arrows and that published notices legally sufficed inasmuch as in the notices the general definition was included. It is stated in the opinion:

"As appellants properly concede, if an industry has been sufficiently clearly defined by the Administrator, and notice and opportunity for hearing have appropriately been given in accordance with the requirement of the Act, the question whether a particular product should have been included in such industry or in another, or in some special classification thereunder, is primarily a matter of administrative convenience and judgment; *(Opp Cotton Mills* v. *Administrator, supra)*, and, in any event, where there has been a sufficiently clear definition by the Administrator and notice and opportunity for hearing have been

duly given, any question of unreasonableness or arbitrariness in connection with the issuance of a wage order is reachable judicially only by petition for review . . .

". . . this does not mean that Congress intended to compel the Administrator to enumerate in his definition every specific product which the order was designed to cover. Such an attempted enumeration . . . would certainly be a most difficult if not an impossible task. The power delegated to the Administrator to make definitions and classifications and to fix wage rates on the basis thereof manifestly was intended to assist in furthering the broad remedial purposes of the Act, . . . On the basis of these principles, we believe that the Administrator, in formulating a definition for wage-order purposes, is only required to outline with reasonable clarity and certainty the general limits or extent of the industry sought to be covered, and that, where this has been done and general opportunity for hearing, on notice, has been duly afforded, there is no legal injustice involved in administratively applying the order to any product which, by sound implication and natural interpretation, falls within the boundaries that have been set, and which has not been specifically excepted therefrom. Here, as in the general testing of any legislative remedial act, it is reasonable and practicable certainty, and not legalistic preciseness, that is the sound criterion . . .

". . . the Administrator was not required, nor could he be expected, to make an enumeration of the many minor products that might be involved in the industry, and such products, in which wood was the basic and principal component used in the manufacturing processes, and which were not made the subject of a specific exception, were sufficiently included in the general term 'specialized timber products' . . .

". . . Due process in a proceeding of this character does not require that all those who may be affected by a contemplated wage order shall have had personal knowledge of the pendency of the proceeding or of the promulgation of the order. The statute does not so require, and such a condition would be utterly impossible in practice. The constitutional guaranty of due process demands only that such provision for notice and opportunity for hearing be made as is fair and reasonable in the situations that may be involved, . . . Notice of hearing 'by publication in the Federal Register and by such other means as

the Administrator deems reasonably calculated to give general notice to interested persons' sufficiently satisfies the general requirement of due process in a proceeding for the promulgation of a remedial wage order by the Administrator, under an industry definition which can soundly be said to indicate to the producers of particular goods that their product is in all reasonable certainty covered by the definition and within the scope of the proceedings being had. The mere fact that an individual producer does not actually learn of the hearing or of the promulgation of the order at the time is not controlling."

The same general view expressed in the afore-cited case is ratified in *Walling* v. *Cohen*, 140 F. 2d 453, where it is specifically held that by virtue of a liberal construction of the Fair Labor Standards Act, in order to effectuate its intent and remedial purpose, a definition of the apparel industry which embraces the manufacture of all apparel made by the cutting, sewing and embroidery process covers apparel in general including hats and caps. It is set forth that it is unnecessary for the Administrator to identify specifically each article embraced by the word "apparel" since to demand such specific identification would be an unreasonable as well as an unwarranted imposition.

The general doctrine set forth in *Pearson* v. *Walling, supra,* is cited with approval in *Walling* v. *Brooklyn Braid Co.,* 152 F. 2d 938, and there it is held that a wage order containing a general definition of the embroideries industry whether hand or machine-made is broad enough to cover the manufacture of bows and tassels, although they were not specifically mentioned in the definition since the omission of those particular words was not decisive and it was likewise held that when the interpretation the administrator has given the wage order embraces the production of particular articles it must be made effective by the court unless it appears that his action was arbitrary or capricious. *Walling* v. *Cohen, supra.*

In *Walling* v. *Higgins,* 47 F. Supp. 856, they held that a wage order referring to the paper products industry includes

within its scope the production of sample books using paper as a component.

In 56 C.J.S. 729, the general rule is summarized as follows:

"Under Fair Labor Standards Act § 8(f), 29 U. S. C. A. § 208(f), it is required that wage orders promulgated by the Administrator shall define the industries and classifications therein to which they apply, but the administrator need not enumerate in his definition every specific product which the order was designed to cover. The definition is only required to outline with reasonable clarity the general limits of the industry sought to be covered, and where this has been done, and general opportunity for hearing on notice has been duly afforded, there is no injustice in administratively applying the order to any product which, by sound implication and natural interpretation, falls within the boundaries that have been set and which has not been specifically excepted. . . ."

Referring now to the particular circumstances of the case at bar, as we have previously stated, the corresponding notices for the designation of candidates to be members of the committee and for the holding of the public hearing of the interested parties and of the public, required by § § 8 and 9 of the afore-mentioned Minimum' Wage Act were published. In the notice of public hearing published on September 16, 1944, it is stated that the hearing of the Board referred to the employees in retail business. In the notice requesting candidates to form the committee, published on May 11, 1944, it is stated that the employers or employees are those comprised in the definition of retail business, "which may be enlarged or limited as amended for said purpose" and the definition that we have previously described in this opinion was expressly included in the notice. A fair and logic interpretation of that definition told appellant herein, as an interested party, that the prospective decree on retail business logically included those of appellant's employees who were directly engaged in retail sales, that is, in selling ice directly to consumers. The acts, func-

tions, work or service of those employees were, and are, incidental to or connected with retail business, and such ice sales to consumers originated, and still originate, in the establishment or place belonging to appellant, which is engaged, at least partially, in the selling of ice to consumers, all of which is in accordance with the terms of the definition which was duly published. Besides, the nature itself of the ice manufacturing business implies that the very life, the sole purpose and essence of said business consists precisely in carrying out retail sales directly to consumers. The manufacturing process is, naturally, necessary to carry out the sale but, from a relative point of view, the processing is incidental to the basic function of the business which is the direct sale to consumers. The situation could possibly differ as to a manufacturing business of certain products which involves complex organizations where different middlemen are employed, contacting the consumers finally and indirectly but in the case of an ice plant the contact between the manufacturer and the consumers is much more direct and less complex, for which reason it is fair and reasonable to include in the general definition of retail business those employees in the ice business engaged in selling that product directly to the consumers.

In 56 C.J.S. 676 it is stated that the fact that the business engages in processing incidental to retail selling does not alter its retail character as to remove it from the category of a retail establishment. *Fountain* v. *St. Joseph Water Co.,* 180 S. W. 2d 28; *Bozeman* v. *Rhodes-Jennings Furniture Co.* 181 S. W. 2d 142. That rule does not apply when the processing is not merely incidental to retail selling. *Walling* v. *West Kentucky Coal Co.,* 60 F. Supp. 681. When an employer operates a manufacturing plant and a retail establishment at the same time, employees engaged in the retail business may be exempt from Fair Labor Standards Act while employees of the manufacturing department are not, each individual employee's status being therefore con-

sidered separately under the Act. *Fletcher* v. *Grinnel Bros.*, 62 F. Supp. 258; *Prescription House* v. *Anderson*, 42 F. Supp. 874; *Phillips* v. *Walling, supra.* The ice manufacturing business involved herein must fall within the category already pointed out in which the processing is incidental to retail business and, therefore, the workers to which this case refers must be considered as employees engaged in retail selling. See also *Gustavson* v. *Fred Wolferman Inc.*, 73 F. Supp. 186. At least the definition of retail selling duly published in the newspapers must have been sufficient to call the attention of appellant herein and put him on guard so that he should make the corresponding investigation as to the meaning of the decree, and protect himself duly. Pike & Fisher, Digest of Administrative Law, Vol. 1, p. 72; McFarland & Vanderbilt, Cases on Administrative Law, p. 641; *Cf. Market Street R. Co.* v. *Comm'n*, 324 U. S. 548. Regarding notice of hearings in administrative agencies, in *United States* v. *Wrightwood Dairy Co.*, 127 F. 2d 907, it is held that the validity of a hearing depends on whether the issues are clearly defined, whether the purpose of the hearing is clear and whether everyone knew of the general considerations. It is held that literal identity between a proposed marketing agreement and an order as issued, is not required.

We have already seen that in § 30 of the afore-cited Act No. 8 approved on April 5, 1941 the term business includes every work or labor in places of any kind where commercial transactions are made. The selling of ice implies a business transaction and falls therefore within the definition of "business." It is also convenient to point out that under § 12 of the afore-cited Act as amended by Act No. 9 approved on March 20, 1942, the Minimum Wage Board has the power to classify the work of any occupation, business or industry according to the nature of the services rendered and to fix wages for different kinds of works. It implies the faculty to establish a difference between different kinds of employees

and therefore to include different kinds of employees in different decrees.

■ Regarding the constitution of the committee which formulated the recommendations resulting in the approval of Decree No. 8, the fact that the manufacturing and selling of ice was not represented in said committee does not imply by itself that such decree can not be validly applied to that business. In the first place, all the interested parties were publicly notified to submit candidates for the organization of said committee and, as we have seen, in said notice the definition of the business to be covered was set forth. The manufacturers and retail sellers of ice had thus the opportunity of submitting candidates, when they found out that said definition was logically applicable to the employees in the ice business who directly sold ice to the consumers. Besides, the requirement of notice and opportunity to be heard is not necessarily applicable to the stage of the proceeding which refers to the actions of the committee. *Opp Cotton Mills* v. *Administrator, supra. Walling* v. *American Needlecrafts*, 139 F. 2d. 60, holds that an averment to the effect that certain industrial codes fixing salaries did not cover a number of employees on ground that no representative of a particular industry was selected upon the board charged with administration, lacks merits since it is neither convenient nor possible in the regulation of an industry to give representation to every specialized branch thereof. See also *Andree & Seedman Inc.* v. *Administrator*, 122 F. 2d 634.

■ We must point out that if an administrative decision as the decree involved herein, affects or is applicable to an employer, the latter must follow the procedure established by law to obtain a judicial review of that administrative decision. That remedy of judicial review as to the validity and scope of the order or administrative decree is in such a way exclusive that in failure to follow said proceeding of review the employer is barred from protesting or challenging the decree in an independent action against the employer to

render said order or decree effective. *Yakus* v. *United States*, 321 U. S. 414, 427, 433, 434; *Lockerty* v. *Phillips*, 319 U. S. 182; *Bowles* v. *Willingham, supra*, at page 516. Specifically referring to wage orders, in *Walling* v. *Cohen, supra*, it is held that the defendants did not request the court to review the wage order and that therefore, they are not in a position to question the competency of said order in another suit to restrain the violations thereof. In this last case the administrator did not notify defendants that they were subject to the orders and that there was still time to seek a judicial review. Therefore this last case has no direct bearing on the present case. However, the general ruling set forth in *Yakus* v. *United States, supra*, and *Bowles* v. *Willingham, supra*, is in point. See also *Caguas Bus Line Inc.* v. *Commissioner of Labor, ante*, p. 690 and *Commissioner of Labor* v. *South Porto Rico Sugar Co., ante*, p. 151.

The judgment appealed from will be affirmed.

Mr. Chief Justice Todd, Jr., did not participate herein.

Mr. Justice Sifre concurs in the result.